ISAAC MCDANIELS *Executor of* JAMES MCDANIELS *v.* THOMAS
MCDANIELS.

*New Trial. Jurors.*

Conversations had with jurors about the case on trial by the friends of the prevailing party, intended and calculated to influence the verdict, constitute a sufficient cause to warrant the court in granting a new trial, even though not shown to have influenced the verdict in point of fact, and though they were had without the procurement or knowledge of the prevailing party, and listened to by the jurors without understanding that they were guilty of misconduct in so doing.

A motion for a new trial, upon the ground of misconduct by jurors during the trial, need not contain an averment that the misconduct was unknown to the moving party before the jury retired. It would seem to be otherwise when the objection to the juror is some matter which existed before the trial commenced, and which might have been a cause for challenge.

The fact that the moving party neglected to inform the court, before the jury retired, of misconduct on the part of jurors during the trial which came to his knowledge, would not, if proved, necessarily, as a matter of law, defeat the motion for a new trial, but would be one circumstance to be considered with others by the court in determining whether, in their discretion, to set aside the verdict.

APPEAL from the probate of an instrument purporting to be the last will and testament of James McDaniels, deceased. The case was tried by jury, at the September Term of the Rutland County Court, A. D. 1866, upon the issue joined upon the plea, that the instrument is not the last will and testament of the deceased, and a verdict was rendered for the proponent. After verdict, and before judgment, a motion was filed by the defendant to set aside the verdict for several causes, among which was the following: ".For that some of the panel of jurors, after they were empannelled, and during the progress of the trial, and out of court, were talked to and with, upon the subject of said cause, and favorably to the proponent, by the agents, emmissaries and friends of Isaac McDaniels, and by them were urged and solicited, and influenced by improper conversations with said jurors, or in their presence, to render a verdict in favor of the proponent." This motion was supported by accompanying affidavits. Further testimony was taken and filed by both parties, and at an adjourned session of the county court, PECK, J., presiding, the verdict was set aside for the cause above assigned,—to which decision

the proponent excepted. The exceptions were allowed, subject to the opinion of the supreme court whether exceptions will lie in such a case. The exceptions set forth that the court found that the conversations detailed in the affidavits were had with, and in the presence of the jurors who tried the cause, during the trial, and that several of the persons holding such conversations, were the friends of the proponent, and that they held such conversations for the purpose of influencing the verdict of the jury in his favor; that this was done without the procurement of either the proponent or the defendant, and without the knowledge of the proponent. And the court did not find that it was done with the knowledge of the defendant. It was also found that the conversations were of a character directly calculated to influence the verdict in favor of the proponent.

The court did not find any corruption, or intentional misconduct in any of the jurors, but did find that some of the jurors were guilty of impropriety in suffering conversations to be held with them, and in their presence and hearing.

The counsel for the proponent contended that the court could not legally set aside the verdict; and particularly because it was not set forth in the motion, nor in the affidavits sustaining the same, that the defendant had no knowledge of the conversations when they occurred, and before the jury retired to consider the verdict. But the court held this not to be in law essential.

The following is a condensed statement of the conversations to and in the presence of jurors, which the court found took place:

Nearly at the close of the trial, during a recess of the court, on the steps of the Franklin House, Hyde used the following language in the presence and hearing of two jurymen: " I have heard the whole case so far, and I don't see how they are going to get around that will. They have proved it beyond a doubt, and there is no way they can get around it in my mind."

On two or three occasions, in and about the Franklin House, during the trial, in the presence and hearing of jurymen, Hyde stated " that there wasn't a doubt but that it was McDaniels' will." And on one of these occasions was rebuked by the landlord for talking in the presence of jurymen.

On the court house steps, during a recess of the court, in the presence and hearing of four of the jurymen, Hyde used the following language: "I don't see how in the devil the jury can get rid of sustaining that will, as it is undoubtedly the old man's will."

John S. Emery, one of the jurors who tried the cause, testified that "there was a good deal of talk between said Hyde and members of said jury, and from the remarks of said Hyde, so far as they related to the subject of said trial, it appeared evident they were expressions in favor of the will." Again: "No one could fail, on hearing the conversations of said Hyde, to understand that his feelings, sympathies and expressions were in favor of the will." Again: "At one time when said Hyde endeavored to get at my opinion in said cause, I said to him that I thought he had better not talk so much about the case."

Franklin L. Frost, another of the jurymen, testified as follows: "I have some impression that Hyde made some remarks about said will, in my hearing; used some expressions, but the precise language he used has gone from my memory. The general impression left upon my mind is, that what he did say was favorable to said will."

Harry Rathbone said, in the presence of one of the jurymen, in W. H. B. Owen's store, during the trial, "that they had proved the will to his mind. There must have been a great deal more said, but I can't recollect what it was."

Nathan Smith, Jr., one of the jurymen, testified that on the same occasion alluded to by Owen, he "heard Rathbone say it was James McDaniels' will, from the fact that the old gentleman looked after it, or called upon Dr. Otis' son to enquire about the will after the death of his father, and to see that the will was kept safe."

Rathbone, himself, gave the following version of the same conversation: "Owen asked me how the McDaniels case was going. I told him that I never knew anything of the case until I had heard this trial so far; that from the testimony in regard to the making of the will, those who knew James McDaniels and Dr. Otis would know that James McDaniels never signed that will without hearing it read inch by inch, and that Dr. Otis was not the man to deceive him." * * * "The question then came up, how Isaac could slip in a

will in place of one that Dr. Otis wrote. We had considerable fun over this, and queried how Isaac could get the Dr. to write it, and thought Isaac must have pretty good genius, or something of that kind." In his direct examination he said: "I am pretty sure he (the juryman) must have heard us."

In reply to Rathbone's remark that "those who knew James Mc-Daniels and Dr. Otis would know that James McDaniels never signed that will without hearing it read to him inch by inch, and that Dr. Otis was not the man to deceive him, W. H. B. Owen said "that that was his opinion ; that Isaac had been very kind to the old man, as he supposed, and you would almost universally see them walking in the street daily." That he (Owen) "was not much acquainted with the old man, but Major Hodges used to frequently call upon him, and that the Major thought it was the old man's will."

Nathan Smith, Jr., the juryman in whose presence the conversation between Owen and Rathbone took place, testified : "I think I heard Mr. Owen say he was satisfied it was James McDaniels' will." "He said that from one or two letters he had heard read, he was satisfied that Isaac didn't know anything about the will until after his father's death.

W. H. B. Owen testified : "As near as I can recollect it, Rathbone came into the store. I think the whole conversation was about the will, but it might have related to other parts of it. I think the amount of the conversation was that they had proved the will to his mind ; and I think that I told him, from what I heard old people say, from Tinmouth and Danby, that I thought it was his will. That was the amount of the conversation. There must have been a great deal more said, but I cannot recollect what it was." Again : "In speaking of the old men that I had heard talk about it, I think I named Judge Noble, and might have named Major Hodges." "If I said anything about Judge Noble to him, I think I said that I had heard Judge Noble express the opinion that it was the old man's will." - "I might have said that I had heard Major Hodges, Judge Noble, and old men from Danby, express the opinion that it was the old man's will."

Nathan Smith, Jr., one of the jurors, testified that during the trial,

McDaniels, Ex'r, *v.* McDaniels.

on the steps of Cheney's store, Alanson Dyer addressed conversation to him about the will. " I heard Alanson Dyer speak of the will. He said he believed it was James McDaniel's will, and he thought the property was going were the old man wanted to have it go. He said Isaac McDaniels had carried him around on his arm for twenty years, and you (Smith) would not do it for five thousand dollars a year."

Alanson Dyer gave this version of his conversation with the juryman Smith : " I recollect of saying that I had heard enough of the trial to satisfy me that it was a valid will; and being acquainted with Mr. McDaniels, I believed he made it understandingly, and just as he was a mind to make it. I recollect of saying further, that the reputation of the witnesses to the will was such that they could not have been deceived, and that it must have been done understandingly. I still remarked, I think, that I thought the old man meant to do more for Isaac than for the rest of them, for the reason that he was to take care of him, and did his business for him. That Isaac McDaniels or Thomas McDaniels would not have been hired to have waited on the old man, and have led him around for five thousand dollars a year. That is the sum and substance of what I said there in general."

John F. Thompson, one of the jurymen, testified that Hiram Fisk, " who was one of the jury in attendance upon said county court at the present term, but not on the panel that tried the will case, also took frequent occasion to tell me, during said trial, that the will in question was the will of James McDaniels, and that there was no doubt about it. I tried to avoid such conversations, but the said Fisk, who roomed with me, and who was from the town of Danby, took frequent occasions to make such remarks to me, and in my presence." In his deposition, afterwards taken by the proponent, he says these conversations were " at our room at the Franklin House, after we had retired. No one else was present."

John S. Emery, one of the jurymen, testified that during the trial, " on several occasions, Daniel Packer would seek conversations in my presence or in my hearing on the subject of said will." Again : " So far as I heard expressions from him in regard to said will, any

body would know of course, that his feelings and expressions were favorable to said will. On one occasion I heard him say that he knew both James McDaniels and Dr. Otis, and that any one that knew those men would believe that this will was just such an one as they would make. I guess Thompson (another juryman) was present at that time, and I don't remember that there was any one else in particular."

John F. Thompson, one of the jurymen, testified that during the trial. Daniel Packer " talked a good deal about said trial and about said will, in my presence and in presence of others of the jury. There was hardly a meal that he did not talk more or less on the subject. I heard said Packer say that he was well acquainted with Dr. Otis and James McDaniels, and from what he knew of both of them, there was no doubt but what it was his will, and just as he wanted it. He made a great many remarks in regard to the will of a similar character. The said Packer told me he was at Rutland for Thomas McDaniels. I heard others whom I do not know, talk in regard to the will, and express their belief that it was James McDaniels' will."

Franklin L. Frost, one of the jurymen, testified that " after the jury were empannelled, in conversation with some one in my hearing, I heard the 'said Daniel Packer state that he was acquainted with James McDaniels, and went on with some remarks about him which I cannot now exactly repeat, but to the purport that he was a very cautious man, and very straight forward, and hard to turn aside from his purpose." Frost also testified that towards the close of the trial Packer approached him. and asked him in an under tone how he thought the case would go.

Elisha C. Harrington testified that " on several occasions during said trial I heard Daniel Packer, of Mount Holly, talk in the presence of and directly to several of the jurymen who were on the panel, and who decided said cause. On one occasion I heard the said Packer talking to Emery, the juryman from Wallingford, and in the presence of two others of the jurymen that were on said panel, and the said Packer on the said occasion stated that he had had talks with James McDaniels in regard to his will, and that this was his will ; that the

said James McDaniels had told him how he had made his will, and that there was no doubt at all about the matter of its being his will. I did not know the names of the other two jurymen, but I know they were on the panel that tried said cause, as I was in the court house every day, and saw them in the jury seats during said trial. I also heard the said Packer, on two other occasions, during the trial, talk in the presence of one or ,more of said jurymen, in which he made similar statements as above, on all of which occasions he stated his belief that it was James McDaniels' will, from what he knew of James McDaniels, and from what he had heard him say."

*E. Edgerton* and *Daniel Roberts*, for the plaintiff.

1. As a general proposition it may be said, that the setting aside of a verdict, and the granting of a new trial, rests in the discretion of the county court, to which no exception lies. But this discretion is not unrestrained license. It is limited by legal principles and legal rules. It depends both as to its exercise at all, and, in a degree, as to the mode of its exercise, upon the facts found. So far as the decision below can be resolved into a legal conclusion from the facts found and stated upon the record, it is subject to revision. *Joyal* v. *Barney*, 20 Vt. 159–160; *Briggs* v. *Georgia*, 15 Vt. 61; *French* v. *Smith et al.*, 4 Vt. 363.

2. The court reports, that the conversations referred to " were of a character directly calculated to influence the verdict in favor of the plaintiff," but does not find that the verdict was thus influenced; that there was no " corruption nor intentional misconduct in any of the jurors;" and that those conversations were had " without the procurement of the plaintiff, and without his knowledge." Courts will not visit the consequences of an irregularity upon an unoffending party, unless it appear that it has wrought some injury to the other party. *Dennison* v. *Powers,* 35 Vt. 39; *Downer* v. *Baxter*, 30 Vt. 467; *Blaine* v. *Chambers*, 1 Serg. & Rawle, 169; 2 Grah. & Wat. N. T. 309, 310, 312, 317.; *Shea* v. *Lawrence*, 1 Allen, 167.

3. This was not a proper case for the exercise of any discretionary action of the court, inasmuch as it must be assumed that the defendant knew of the matters complained of, at the time of their occur-

McDaniels, Ex'r. *v.* McDaniels.

rence, and did not bring them to the knowledge of the court before the verdict, but lay quiet, speculating upon the chance of a verdict in his favor.

On this point the case states the non-finding of the court. " The court did not find that it was done with the knowledge of the defendant "—thus distinguishing between this and the positive finding in respect to the plaintiff's knowledge.

. Clearly the tendency of the testimony was to prove this knowledge on the part of the defendant.

But to warrant setting aside the verdict, it should be both stated in the motion and be proved affirmatively, that the defendant did not know of the matter complained of before the rendition of the verdict. *Brunshill* v. *Giles*, 9 Bing. 13 ; *Herbert* v. *Shaw*, 11 Mod. 118 ; *State* v. *Camp.*, 23 Vt. 551 ; *Jameson* v. *Androscoggin R. R.*, 52 Maine, 412 ; *Pettibone* v. *Phelps et al.*, 13 Conn. 445 ; *Selleck* v. *Sugar Hollow T. Co.*, 13 Conn. 452 ; *Woodruff* v. *Richardson*, 20 Conn. 237 ; 2 Grah. & Wat. N. Trials, 303, 575.

*Charles C. Dewey* and *A. Potter*, for the defendant.

I.   Exceptions will not lie, and the case should be remanded.

*a.*   The court found the fact that the persons guilty of tampering, were the friends of the proponent.

*b.*   That the conversations were of a character directly calculated to influence the verdict of the jury in favor of the proponent.

*c.*   That they were held for the purpose of influencing the verdict of the jury in his favor.

*d.*   That the jurors were guilty of impropriety in suffering such conversations with them, and in their presence and hearing.

*e.*   And that the conversations were in violation of law.

II.   As a motion for a new trial, for causes *de hors* the record, is and must be addressed to the discretion of the court, the decision can not be revised on exceptions, unless indeed, it be for the improper admission or rejection of evidence, or when it is apparent the decision is based upon a false legal assumption.   *Sheldon* v. *Perkins*, 37 Vt. 557 ; *Shea* v. *Lawrence*, 1 Allen, 169 ; *White* v. *Wood*, 8 Cush. 415 ; *Gra. & Wat.*, Vol. 2, p. 47, n. 4.

It has never been held, or even claimed, that jurors' depositions may not be received to prove the misconduct of the parties or of persons acting in their behalf. *Ritchie* v. *Halbrooke*, 7 S. & R. 458.

III.   1. It is not essential that the tampering be done by the party himself, nor by his procurement. It is sufficient if it be done by his friends and in his behalf. *Deacon* v. *Shreve*, 2 Zab. 176 ; *Coster* v. *Merest*, 3 Brod. & Bing. 272 ; *Knight* v. *Freeport*, 13 Mass. 218 ; *Shea* v. *Lawrence*, 1 Allen, 169 ; *Brunson* v *Graham*, 2 Yeates, 166 ; Pleas of the Crown, vol 2, p. 308 ; *Gra. & Wat.*, vol. 2, p. 298, *et seq.*

2. And even if the attempt to bias the jury be made by strangers the verdict will be set aside if there is fair ground for belief that it has been influenced thereby. *Gra. & Wat.*, vol. 2, p. 309.

3. So, in the class of very numerous cases, where papers have been delivered to the jury by mere mistake, the verdicts have been set aside, whenever the papers had any tendency to bias them. *Whitney* v. *Whitman*, 5 Mass. 405 ; Vin. Abr. Trial, pl. 18 ; *Hix* v. *Drury*, 5 Pick. 296 ; *Sargent* v. *Roberts*, 1 Pick. 337.

4. The same rule obtains, and verdicts will be set aside ; 1, where jurors are allowed to separate before a verdict is agreed upon, if the separation is attended with the slightest suspicion of abuse. *Oliver* v. *Trustees of Pres. Church*, 5 Cow. 283 ; *Horton* v. *Horton*, 2 Cow. 589. 2. Where a juror gives private information to his fellows, material to the issue, which may have influenced them. *Sam* v. *The State*, 1 Tenn. 61. 3. Where jurors re-examine witnesses who have already testified. *Metcalf* v. *Dean*, 2 Bay. 94 ; *Perine* v. *Van Note*, 1 South. 146 ; *Bedington* v. *Southall*, 4 Price, 232.

It thus appears from the authorities above cited, and many others to be found in the books, that the ground upon which courts set aside verdicts for improper attempts to influence the jury, is not merely and only the misconduct of the party, but the possibility that the unlawful attempt, by whomsoever made, or with whatever motive, may have inoculated the verdict with vice or error.

IV.   1. It is a corrollary of the preceding proposition, already incidentally discussed, that it need not affirmatively appear that the verdict was injuriously affected by the tampering. If the purity of

the verdict might have been affected, it will be set aside. And this rule has been adhered to with great rigor and tenacity. *Whitney* v. *Whitman, ubi supra; Cohen* v. *Robert,* 1 Strob. 410 ; *Perkins* v. *Knight,* 4 N. H. 474 ; *Hare* v. *The State,* 4 How. Miss. 187 ; *Com.* v. *Roby,* 12 Pick. 496 ; *Com.* v. *Wormley,* 8 Grattan, 712 ; *Custer* v. *Merest,* 3 Brod. & Bing. 272 ; *Knight* v. *Freeport,* 13 Mass. 218 ; Gra. & Wat. vol. 2, p. 300 ; *Hix* v. *Drury,* 5 Pick. 296.

V. 1. Punishment of the misconducting parties and persons has never been held to be an adequate corrective, except in cases where it is clearly established that the verdict could not have been injuriously affected, for the obvious reason that such punishment cannot purge the verdict of its taint and obliquity. The duty of the jurors not to " speak to any one about the case they may at any time have in charge," nor to " suffer any one to speak to them about the same," and the duty of other persons not to speak to them, or in their presence, is imposed for the protection of the parties. But the rule would be a mockery if the parties were denied redress for the evil consequences of its violation. *Helms* v. *The State,* 13 Smedes & Marsh. 500.

2. The writ of attaint which subjected the jury to infamy, fine, imprisonment, and other severe penalties, upon conviction for misconduct, and which was formerly the only remedy of the aggrieved party, was found after long trial, to be wholly inadequate to prevent the evil of tampering, and to the parties was wholly ineffectual as a remedy. The English courts were forced to abandon it more than two hundred years ago, and to substitute therefor the more just and effectual remedy of granting new trials. Gra. & Wat. vol. 1, pp. 4, 5 ; vol. 2, 131.

*As to the motion :*

The statute empowers county courts to set aside verdicts, agreeably to the usages of law, on motion, but does not require the motion to be in writing. Nor is it required to be in writing even by rule of court. It may be made *ore tenus.*

*As to the affidavits in support of the motion :*

The objection is that it is not " set forth in the affidavits that the defendant had not full knowledge of these several matters when

they occurred, and before the jury retired to consider of their verdict."

Observe that the exception goes simply to the decision of the court that it is not in law essential, and not fatal to the motion, " that the affidavits should set forth that the defendant had not full knowledge," &c.

The objection, therefore, is only that the *factum probandi* is not attested by direct and positive evidence, rather than by evidence which is circumstantial and presumptive. It is the species, not the quality or the conclusiveness of the evidence, that is insisted upon as being essential.

VI. For reasons resting upon both authority and principle, the rule contended for has no application to a case of tampering with the jury after they are empannelled, and during the progress of the trial.

1. In cases where the tampering takes place before the jurors are empannelled, the party has an opportunity to examine jurors as to their qualifications, prejudices and prepossessions, and whether they have held any conversations with the parties or others about the case, and hence it is that it is generally required that a party who asks for a new trial on the ground of objections that might thus have been taken, must show that he had no knowledge of the objections, or that the juror did not answer truly when enquired of. *Herbert* v. *Shaw*, 11 Mod. 118; *Hallock et al.* v. *Franklin*, 2 Met. 558; *Amherst* v. *Hadley*, 1 Pick. 39; *Merrill* v. *Berkshire*, 11 Pick. 269; *Fox* v. *Hazleton*, 10 Pick. 275; Gra. & Wat., vol. 2, pp. 467–474; *Barlow* v. *State*, 2 Blackf. 114; *Whitaker* v. *Carter*, 4 Ired. 461.

The case of *Pettibone* v. *Phelps et als.*, 13 Conn. 445, relied upon by the proponent's counsel, is not fairly in point.

2. Upon reason and principle, the rule contended for should not prevail.

Suppose all these numerous corrupt attempts to influence the jurors had come to the knowledge of the defendant before the verdict was rendered, and the accusation founded thereon was brought to the notice of the court during the progress of the trial, what is to ensue? An issue is inevitably made, as in this very case. The court must adjourn. The parties must, as in this very case, examine

McDaniels, Ex'r, *v.* McDaniels.

witnesses, on the one side and the other, as to whether the jurors were corrupted or had been exposed to corrupt influences.

If the rule contended for be established, it will always be in the power of a party, or of his friends, dissatisfied with the appearance of his case in the progress of a trial, to tamper with jurors, and then take measures to bring the knowledge of it to the adverse party, and thus compel him either to ask for a continuance for this cause, or to submit to a verdict obtained by corrupt practices.

The opinion of the court was delivered by

STEELE, J. The motion for a new trial was properly granted. It was not incumbent upon the moving party to show that the verdict was, in point of fact, influenced by the unlawful conversations. It is quite enough that, in a doubtful case, conversations with the jurors have been had during the progress of the trial for the purpose of influencing and directly calculated to influence them to render just the verdict they did. There is no practicable method to so analyze the mental operations of the jurors as to determine whether, in point of fact, the verdict would have been the same if the trial had been conducted, as both parties had a right to expect, according to law and upon the evidence in court. If the court, in their instructions to the jury err, with respect to some proposition of law, it is well understood that the right of the defeated party, on exceptions to a new trial, does not depend on his showing that the error actually influenced the verdict. It is enough, if its natural tendency is to influence the jury to render their verdict against him, and such may reasonably have been its result. The right to a correct charge from the court is no more sacred or important than the right which, in this case, was violated. The analogy might be carried farther. It is not essential to the right to a new trial, on exceptions, that the error of the court should have been intentional, or by the fault of the prevailing party. So, in this case, the defendant was not any the less likely to be injured because the jurors did not appreciate the impropriety of tamely listening to conversations intended to influence them, or because the plaintiff was unaware of the officious efforts of his friends on his behalf. The friends of

the plaintiff who thus approached the jury were guilty of a flagrant violation of the law, and the jurors who suffered themselves to be so approached, though they may have meant no wrong, were guilty not only of a violation of the law but also of the oath they had taken *to say nothing to any person about the business and matters in their charge but to their fellow jurors, and to suffer no one to speak to them about the same but in court.* Both were liable to severe and summary punishment. The plaintiff, as he was unaware of these transactions, is not liable to punishment, but it does not follow from this that he can hold a verdict which is the result of a trial corrupted, though without his fault, by a shameful disregard of the familiar rules which are necessary to a decent administration of the law. The court set the verdict aside not as a punishment to any one but in justice to themselves, as well as to the defendant, that the trial may be conducted fairly so that the verdict, when finally rendered, may be entitled to the respect of both parties and the confidence of the court as the result of a trial substantially according to law, and upon the evidence in court. It is true that a verdict should not be set aside for every trifling error of law by the court, or for every trifling misconduct of a juror which occurs without the fault of the prevailing party, but it should be whenever the error or misconduct renders it reasonably doubtful whether the verdict has been legitimately procured.

The plaintiff insists that the motion is fatally defective because it contains no allegation that the defendant had not full knowledge of the matters complained of before the jury retired to consider their verdict, and that this is a defect which cannot be cured by proof, and that, even if it could, it has not been in this case, the court merely stating in the exceptions that they did not find that the misconduct occurred *with* the knowledge of the defendant, and not stating that they did find that it occurred *without* his knowledge. We do not think these objections are well taken. It was not incumbent upon the moving party to either allege or prove that he had not such knowledge. If the other party could prove that he had, or if he could prove that he had not, it would be one fact to be considered, with others, by the court in determining whether, in their discretion,

McDaniels, Ex'r, v. McDaniels.

to grant the motion, but the circumstance that the moving party had such knowledge*would not, as a matter of law, defeat the motion. The case is clearly and broadly distinguishable, both in reason and authority, from those in which the objection to the juror is some matter that existed before the trial. If an objection to a juror exists when the jury are empannelled the juror may be challenged and another substituted, and if a party knowing the objecton neglects to challenge he thereby expresses his satisfaction with the juror. But where the objection arises from misconduct of the juror during the trial the opportunity for challenge has passed. Another juror cannot then be substituted and a fair trial thereby secured. If the juror is dismissed it but results in what is asked for here, a new trial. A party ought usually to suggest to the court any serious misconduct of the jurors of which he has positive knowledge, or entirely reliable information, particularly if learned early in the trial, as it *may* result in an immediate discharge of the jury, and a saving of much time and expense. But the fact of the misconduct may be denied, and a court cannot always interrupt a trial to investigate charges against a juror, and must exercise very great caution and discretion to be able to even make inquiries of the jurors with relation to their conduct in such a manner as to create in their minds no feeling of resentment toward either party. We cannot hold that the failure of the party, if proved, to make the suggestion to the court would be more than a circumstance to be considered and weighed, with others, by the court in determining whether, in their discretion, to grant a new trial.

It is very true that in two Connecticut cases it has been held that it is necessary for the party to aver in his motion his ignorance, until after the jury retired, of the misconduct which occurred during the trial. But the later of these two cases, *Woodruff* v. *Richardson*, 20 Conn. 241, professes to be governed by the earlier, *Pettibone* v. *Phelps*, 13 Conn. 452, and in *Pettibone* v. *Phelps* the court, after stating several very good reasons why the motion should be denied, merely add, a point not made by counsel, that the motion is also insufficient for the reason that it contains no allegation that the misconduct of the juror was unknown to the plaintiffs before the trial closed, and that it was settled in *Selleck* v. *The Sugar Hollow Turnpike Co.*, 13 Conn. 453,

that such an allegation was essential. It thus seems that this doctrine, in Connecticut, originally rests solely upon the authority of *Selleck* v. *Sugar Hollow Turnpike Co.* Upon examination of that case it turns out that the objection there taken was not at all misconduct by a juror during the trial, but was a disqualification which existed before the trial, in that the talisman was not an elector in Connecticut but a citizen of New York, and the court hold that if the party knew the fact at the trial he might have challenged the juror provided he did not choose to waive the disqualification, and that he should have alleged that he did not know it in order to excuse his not making the objection seasonably and regularly. It is clear, therefore, that this case is no authority to warrant the decisions which professedly rest upon it.

The views which we have expressed are decisive of the matter before us, and it becomes unimportant to discuss the other questions presented. In the opinion of the court this case presents a state of facts in which the court below, in the exercise of their discretion, not only might without error, but ought to have granted a new trial, and the exceptions to the action of the court in so doing are overruled, and the cause is remanded.