## CALLAHAN v. CHICAGO, M. & ST. P. RY. CO.

(Circuit Court, N. D. Iowa, Cedar Rapids Division. January 25, 1908.)

No. 185.

1. NEW TRIAL—EVIDENCE OF JURORS TO IMPEACH VERDICT—COMPETENCY.
   Jurors may testify to any facts showing attempts of others to improperly influence their verdict; but they may not testify to the effect upon them of such attempts. It is for the court to determine whether or not the attempts shown are of a character that the verdict might have been improperly influenced thereby.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, § 290.]

2. SAME—GROUNDS—MISCONDUCT OF OTHERS AFFECTING JURY.
   Where an improper attempt to influence jurors in a case on trial was such that it might have had an effect on the verdict returned, it is sufficient to condemn such verdict and require a new trial, although the successful party may not have instigated the attempt or had knowledge of it.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, § 96.]

At Law. On motion for new trial.

Wade, Dutcher & Davis and Crosby & Fordyce, for plaintiff.
Cook, Crocker, Loomis & Tourtellot, for defendant.

REED, District Judge. This action is to recover damages for a personal injury alleged to have been sustained by plaintiff because of the neglect of an engineer of one of defendant's trains. There have been two trials of the case. The first resulted in a disagreement of the jury; the second in a verdict of $100 for plaintiff, and he moves for a new trial upon various grounds, one of which is that such improper influences were exerted in the interests of the defendant upon some of the jurors during the trial as to vitiate the verdict. The case was closely contested upon both trials, and the evidence is such that different minds might fairly reach different

conclusions therefrom, both as to the negligence of the engineer and the extent of plaintiff's injury. The verdict should not therefore be disturbed upon the evidence if it was fairly reached.

The jury for the second trial was impaneled in the forenoon of Wednesday, April 3, 1907, the second day of the term; the cause was submitted to it April 8th, and the verdict returned April 9th. Shortly thereafter rumors were rife that the verdict was the result of improper influences exerted upon, and misconduct of, some of the jurors. In a motion for a new trial this was vaguely charged; whereupon the court called upon counsel for the plaintiff for a statement of the facts upon which the charge was based. They answered that rumors were current following the trial that one of the jurors had mysteriously received during the trial a letter containing money, or a check for money, for some improper purpose; that entertainment of some sort had been furnished to others of the jurors by the claim agents of the defendant, or others in its behalf; that these and other similar rumors had become so widespread that voluntary information could not then be obtained to substantiate such charges; but if certain of the jurors and other persons named could be brought before the court and examined, they believed the charges could be sustained. The court thereupon ordered that specific charges be put in writing and filed as a part of the motion for a new trial, and that several of the jurors and other named persons be summoned to appear for examination in regard to such charges. The jurors and persons so named and others have been summoned and examined, and the matter is now finally submitted for determination. From the evidence thus taken, the charge of the improper receipt of money, or a check for money, by one of the jurors is wholly without foundation, and that charge needs no further consideration. It may also be said that others of the rumors are but gross exaggerations of trivial facts occurring during the trial that could not in any event have influenced the verdict. Others of the charges, however, cannot be thus disposed of.

It appears that there was drawn upon the original panel of the trial jury three persons from Hardin county and two from Grundy county. On the first day of the term the panel had been reduced by excuses, or for other reasons, so that it became necessary to draw additional jurors. In this drawing three of those drawn were from Hardin county and three from Grundy county; so that of the trial jurors for that term six were from Hardin county and five from Grundy county. These counties adjoin each other—Grundy lying east of Hardin, in the northwestern part of this division of the district. This case was the first for trial, and upon the completion of the second drawing of jurors in the afternoon of the first day Mr. Earhart, one of defendant's claim agents, and whose duty it was to investigate and obtain information as to jurors summoned, to enable defendant's attorneys to properly exercise its challenges in cases it had for trial, requested, by telephone he says, J. W. Pepperman, of Grundy Center in Grundy county, to come to Cedar Rapids in order that he might get from him information as to the jurors drawn from that vicinity. He also communicated with

Charles E. Shaw of Iowa Falls in Hardin county for the same purpose; but just when, is left in some uncertainty by the testimony. It may have been at the same time that he communicated with Mr. Pepperman, or it may have been shortly before the term. The jury to try the case was composed wholly of jurors drawn upon the first or original panel; none of the second drawing having at the time it was impaneled appeared. William Weimer of Radcliffe, Hardin county, and Anson H. Miller of Grundy Center, Grundy county, were drawn and accepted as two of such jurors. This was the only case defendant had for trial at that term, and it had no occasion to obtain information as to the other jurors after this jury was impaneled. The next morning (Thursday) after the jury was impaneled, Charles E. Shaw of Iowa Falls appeared in Cedar Rapids, and remained there until Saturday night of that week, and during that time he was not in or about the courtroom where the trial was in progress. Mr. Shaw was the right of way agent of a railroad then in process of construction through Hardin county. He had been frequently applied to by claim agents of the defendant prior to this term for information regarding jurors drawn from that vicinity for the federal court, and had been applied to by Mr. Earhart for such information as to those drawn for this term. It is not suggested that there was anything wrong on improper in this, nor could it well be, for it is legitimate for either of the parties to obtain, in a proper manner, such information in order that they may properly exercise their challenges. The claim, however, is that this shows the intimacy between the claim agent and Mr. Shaw and Mr. Pepperman; and it is of their subsequent conduct in this case that complaint is made. Some time during the week before the term, Shaw called the juror Weimer at Radcliffe by telephone, and said to him, as he says, "I heard you are going to Cedar Rapids in a few days, and asked him which way he was going; he told me, and I said I am going to Cedar Rapids during that week, and I will see you there, and we will have a little visit." Radcliffe is some 20 miles southwest of Iowa Falls. No explanation whatever is given why Shaw desired to visit with Mr. Weimer in Cedar Rapids, while there as a juror. Shaw's memory is not very good, but he admits that he had been acquainted with Earhart for a number of years, and might have received a letter from him about jurors before this conversation by telephone with Mr. Weimer. He says that his only mission to Cedar Rapids at this time was to procure from Mr. Allen who lived there about half an acre of land owned by him, for the right of way for the new road for which he was agent; that he was in Hampton, north of Iowa Falls, on Wednesday, and was then informed by an agent of Allen at that place that Allen would be in Cedar Rapids on Thursday; that he then drove to Iowa Falls, and took a late train for Cedar Rapids that evening to meet Allen, without having made any appointment with him, though he knew Allen was a traveling man and away from home a good deal; that he arrived in Cedar Rapids early Thursday morning, and learned that Allen was not at home, and that he had to wait until Saturday to meet him, and

then failed to arrange for the right of way, and it had to be con-
demned. The conversation he had with Mr. Weimer over the
telephone was some days before he received the information at
Hampton that Allen was to be in Cedar Rapids on Thursday of
that week. Shaw says he met the juror Weimer on the street in
Cedar Rapids Thursday, in the evening he thinks, and again Friday
evening at the Allison hotel where he (Shaw) was stopping; that
Weimer then suggested that it would be a nice thing if they could
have a glass of beer together; that Shaw then said he would get
two or three bottles of beer and take them to his room in the
hotel, and they could go there and drink it; that he did get some
beer, crackers, and cheese and that he, Weimer, and Mr. Myers
of Hardin county, another juror (but not engaged upon this trial)
to whom Weimer then introduced him, went to Shaw's room about
9 o'clock, drank the beer, ate the lunch, and stayed there from one
to two hours; that at that time he knew nothing about this case,
and says positively that he did not know that Weimer was then a
juror in any case, and said nothing to him about the Callahan case
at any time. Mr. Weimer denies that he suggested to Shaw that it
would be a nice thing if they could get some beer and drink it to-
gether; and says that Shaw invited him twice to come to his room
at the hotel in the evening; that he accepted the second time, and
he and Meyers then went to Shaw's room one evening where Shaw
had previously provided beer and a lunch for them; that Shaw at
one time met him (Weimer) on the street during a recess of court,
and said to him that the Callahan case was "a hold-up case."
Weimer says that he paid no attention to this; and that Shaw at
another time met him in a billiard room and commenced talking
about the case; said it had been once tried, and the "jury hung";
and that it was a "hold-up case." Weimer then told him that he
was a juror, and that he must not talk about the case. Shaw then
said "I know you are a juror and can't talk about it, but we will
talk it over more fully after the trial." This was after Shaw had
invited him to his room, and after this conversation Shaw said
nothing more to him about the case. Mr. Meyers corroborates Mr.
Weimer that the lunch and beer were in Shaw's room when they
went there.

J. W. Pepperman of Grundy Center, Grundy county, also came to
Cedar Rapids that week, but the date he is unable to state, and it does
not appear, but it was at least a day or two after the jury was impanel-
ed. He arrived about midnight or later, saw Mr. Earhart shortly aft-
er he arrived and had a few minutes conversation with him about
jurors. About noon the next day Pepperman left Cedar Rapids with
a Mr. Thompson, went to North Liberty, and returned to Cedar Rapids
about 6 o'clock in the evening. He is not certain that he saw the juror
Miller before he left that day; but on his return in the evening he
again saw and conversed with Earhart, but what passed between them
is not stated. He then met the juror Miller of Grundy Center, with
whom he was well acquainted, in a billiard room and played billiards
with him until about 8 o'clock, and then they went to a show of some
kind—he is unable to state what. Either on the street, or at the hotel

where Mr. Meyers and Mr. Weimer stopped, they met or found these jurors, and Mr. Pepperman invited them to go to the show with him and Miller. Pepperman had procured tickets for the four and all started for the show, Meyers and Weimer walking together, and Miller and Pepperman together. On the way they met another of the Grundy county jurors (who was not on this trial), and Pepperman invited him to go with them to the show. Pepperman says that he knew Weimer and Miller were jurors on a case on trial, but that nothing was said about it while he was with them, and that he did not know what the case was. It does not appear where Pepperman and Miller went, or what they did, immediately after the show; but Pepperman left for home on a train leaving Cedar Rapids about midnight, the first train after he returned from North Liberty. Pepperman is county treasurer of Grundy county, was formerly sheriff and deputy sheriff of that county for a number of years, and was frequently applied to by claim agents of defendant, including Earhart, with whom he had been acquainted for many years, for information about persons drawn as jurors from that vicinity for this court. He says that he received a telephone message from Earhart to come to Cedar Rapids shortly before he came, that he was intending to come soon, and then concluded to come to consult Mr. Thompson, who was agent for a safe company, about purchasing a safe for the county of which he was treasurer; that he had no previous negotiations with him about the matter, and had no appointment to meet him; that he was acquainted with Thompson, knew that he was a traveling man and absent from home a good deal, but that he had been informed by some others of the county officers that he would be at home about that time; and it was to look at a safe or a safe door that he went with Thompson at his request to North Liberty. The county subsequently bought a safe from another company. Grundy Center is about 70 miles from Cedar Rapids, and Iowa Falls some 30 miles farther. Earhart says that he offered to reimburse Pepperman for his expenses in coming to Cedar Rapids, but that he declined to accept anything. It also appears that one Youell, a former sheriff of Benton county, was in Cedar Rapids during the second trial of the case, and was seen around the federal building at different times. One of the jurors drawn for the term at which the case was first tried testifies that at that time Youell approached him and said, "If you are drawn on this coming case of Callahan against the railroad company, if you can do anything for the Milwaukee Railroad Co., I will see that your expenses are paid. I was not drawn on the jury, but I saw him around the courthouse, and I thought he was more or less acquainted with all of the jurymen." There is no evidence that Youell approached or said anything to any of the jurors at the term of the second trial. It appears that the jury stood 9 for plaintiff and 3 for defendant for about 20 hours before the verdict was agreed upon. They at one time reported their inability to agree, but were required to return and make a further effort to do so. Mr. Weimer was one of the nine who stood for the plaintiff, and Mr. Miller one of the three who stood for the defendant. The foregoing is in substance the testimony showing the conduct of Shaw and Pepperman with members of the jury.

The theory of defendant is that inasmuch as the juror Weimer stood consistently for the plaintiff to the last, he was not influenced in the least by the conduct of Shaw, whatever that conduct may have been, therefore that conduct was not prejudicial; and, as nothing was said about the case by Pepperman to either of the jurors Weimer or Miller, they could not have been influenced in any way by Pepperman's conduct. It is also said that Pepperman was a politician and office holder in Grundy county, a member of the minority party in that county and "a good mixer," whatever that may mean, and was always elected by large majorities over his opponents of the majority party (all of which the defendant developed by its examination of Pepperman), and that what he did at Cedar Rapids at this time was, as he says, only "mixing a little bit," presumably to make himself popular with these jurors; and therefore the verdict should not be disturbed because of his conduct. It would seem that much reliance was placed upon the credulity of the court in advancing the latter as a reason for excusing the conduct of Pepperman with these jurors. A more plausible theory for the presence of Pepperman in Cedar Rapids at that time might be that his qualities as "a mixer" was known to the claim agent of the defendant, and that he thought "a little mixing" by Pepperman among the jurors from his neighborhood who were upon this trial might at least prevent any substantial verdict against this defendant. Be this as it may, that Shaw and Pepperman came to Cedar Rapids at this time for the sole purpose as stated by them, respectively, of negotiating for a half acre of right of way, and to see about a safe for Grundy county, is inconsistent with the established facts. Earhart admits that he requested them to come; and that they came at this time solely in response to that request is the only reasonable inference that can be drawn from the whole testimony. Earhart's motive in so requesting them may have been for the purpose of obtaining, in a proper manner, information as to the jurors from these counties that were summoned upon the second drawing; and he may be entitled to the benefit of such a presumption; but after the jury in this case was impaneled he then had, and he so says, no occasion for such information. But the conduct of Shaw with the juror Weimer was reprehensible in the highest degree, and it cannot be successfully defended. That he intended to poison the mind of Weimer against the plaintiff is not a matter of doubt. If the attempt failed it was not his fault.

Mr. Weimer is, or had been, a member of the board of supervisors of Hardin county, and is a man of good character and standing; but his acceptance of the invitation of, and entertainment from, Shaw, instead of reporting his conduct to the court, after he had attempted to poison his mind against the plaintiff, subjects him to criticism, though doubtless he did not realize that he was doing anything improper. That Pepperman's conduct was also pernicious, and but little less reprehensible than that of Shaw, is also clear, though he and Miller both say that no word was spoken between them with reference to the case. But the very absence of such words in view of their relations, and the kindly treatment of the juror, may have exerted a far more insidious, and therefore dangerous influence than any words that

could have been spoken. Their conduct brings suspicion upon and discredit of this verdict; and a verdict tainted with suspicion that it is the result of improper influences exerted upon the jurors tends to destroy all confidence in, and respect for, the trial by jury, and should be set aside as a matter of public policy.

It is strongly urged in behalf of defendant that it knew nothing of the influences exerted upon these jurors, and it should not therefore be deprived of its verdict, which it claims the evidence is amply sufficient to sustain. Some authorities may support this contention. But pretermitting the question of the knowledge of the claim agent of the conduct of Shaw and Pepperman, and admitting, without deciding, that he did not instigate such conduct, it is clear that the conduct of Shaw, at least, was exerted in the interest of this defendant; and the weight of authority and the better reason is that that is sufficient to condemn the verdict where the improper conduct is such that it might have influenced it in favor of the party for whom it is returned. Welch v. Taverner, 78 Iowa, 207, 42 N. W. 650; Stafford v. Oskaloosa, 57 Iowa, 748, 11 N. W. 668; Johnson v. Root, 2 Cliff. 108, Fed. Cas. No. 7,409; McDaniels v. McDaniels, 40 Vt. 363; Bradbury v. Cony, 62 Me. 223, 16 Am. Rep. 449. Neither of the jurors would admit that he was influenced by anything that was done by either Shaw or Pepperman, and it was hardly to be expected that they would; but they are not permitted to say this. They may testify to any facts showing attempts to influence them, and it is then for the court to determine whether or not what had been done was of such character that it might have influenced the verdict. Mattox v. United States, 146 U. S. 140–148, 149, 13 Sup. Ct. 50, 36 L. Ed. 917. Who can say that the poisonous suggestion of Shaw that "this is a hold-up case, it has been tried once and the jury hung; I know you are a juror, and can't talk about it, but we will talk it over more fully after the trial," may not have unconsciously influenced the juror Weimer to yield his convictions to those of Miller, the friend and fellow townsman of Pepperman who had furnished entertainment to them both, and that prejudices thus resulted to the plaintiff?

In Johnson v. Root, above, Mr. Justice Clifford says:

"Any improper influence with jurors may afford sufficient ground for granting a new trial, and it is not necessary that the attempt to influence the jurors should be made by one of the parties nor even by his agent. It is sufficient that it clearly appears that it was done in his behalf, and it is never necessary to show that misconduct controlled or determined the verdict, providing it was of a character that might have had undue influence."

Jurors must be kept free from all possible influences. When exposed thereto it will not do to inquire into the probability of the extent of the influences, and their effect upon the verdict. There is no safety except in setting aside the verdict in a case where acts and conduct are such that could have influenced the verdict. Welch v. Taverner, 78 Iowa, 207, 42 N. W. 650.

In McDaniels v. McDaniels, 40 Vt. 363, it is said:

"The friends of the plaintiff who thus approached the jury were guilty of a flagrant violation of the law, and the jurors who suffered themselves to be

so approached, though they may not have meant any wrong, were also guilty. * * * The plaintiff was unaware of these transactions; * * * but it does not follow that he could hold a verdict which is the result of a trial corrupted, though without his fault, by a shameful disregard of familiar rules, which are necessary to a decent administration of the law."

In Bradbury v. Cony, 62 Me. 223, 16 Am. Rep. 449, above, it is said.

"The effect on the jury is the same when the tampering is by the party or by his friends or relatives, whether with or without his knowledge."

For other instances where the misconduct was held to vitiate the verdict, see Stafford v. Oskaloosa, 57 Iowa, 748, 11 N. W. 668—where one of the attorneys of the successful party participated in celebrating the anniversary of the birth of one of the jurors, though the case on trial was not mentioned; Veneman v. McCurtain, 33 Neb. 643, 50 N. W. 955—where a third party furnished cigars to the jury while deliberating, saying they were from defendant, but jury might consider them from either party; Poole v. C. B. & Q. R. Co. (C. C.) 6 Fed. 844—where some of the jurors used the room of one of the counsel of the successful party at a hotel, in which to play cards evenings, counsel not present; Ensign v. Harney, 15 Neb. 330, 18 N. W. 73, 48 Am. Rep. 344—where two of the jurors used the team of one of the attorneys, with his permission, to go home during recess of court for Sunday. See, also, Morse v. Montana Purchasing Co. (C. C.) 105 Fed. 337. The rule deducible from these and other authorities is: That where an improper attempt is made to influence jurors in favor of one of the parties, which might have had that effect, a verdict in favor of such party will be set aside, though the attempt was made without his knowledge or authority.

That the improper influence exerted upon these jurors was in the interest of the defendant is not a matter of doubt; and the court will not stop to weigh with exactness the effect of such influence upon this verdict. It is sufficient to know that it was exerted, and that the verdict might have been influenced thereby. It must be understood that no verdict should be permitted to stand, against which, from established facts, the slightest inference rests that it bears the taint of improper influence exerted by or in behalf of the party in whose favor it is returned. Mattox v. United States, 146 U. S. 140–149, 13 Sup. Ct. 50, 36 L. Ed. 917. To uphold this verdict would be, impliedly at least, to approve of the conduct of both Shaw and Pepperman with these jurors; and that would be to cast a most serious imputation upon the trial by jury in this district. Whether or not the evidence is sufficient beyond doubt to convict either of these parties of contempt, or that the evidence given by either could be used against him for that purpose, need not be determined, for that question does not now arise. It does not follow, however, if it is not, and could not be so used, that this verdict should be permitted to stand; and it will be set aside because of their misconduct. Other grounds of the motion are deemed to be untenable, and each thereof will be overruled.

It is not contended that any of the counsel for defendant are responsible for this misconduct, and there is no evidence that in any way

connects any of them therewith, or that unfavorably reflects upon them in the least.

The verdict will be set aside for the reasons above stated, at defendant's costs of the motion for a new trial, and a new trial granted. It is ordered accordingly.