GEORGETTE PRAIRIE *v.* ISLE LA MOTTE TELEPHONE COMPANY.

October Term, 1936.

Present: POWERS, C. J., SLACK, MOULTON and SHERBURNE, JJ., and JEFFORDS, Supr. J.

Opinion filed November 4, 1936.

392

*H. A. Bailey* for the petitioner.

*M. G. Leary* and *Bernard J. Leddy* for the petitionee.

SLACK, J.   At the April Term, 1935, of Grand Isle county court the plaintiff obtained a verdict and judgment against the defendant for $2,944.36.   The defendant brings this petition for a new trial because of the alleged misconduct of a juror who sat in the former trial.   The petition is dated May 9, 1936, and alleges that while the trial was in progress, to wit, on the morning of May 9, 1935, Fred Martelle, a brother-in-law of the plaintiff, and Nelson Langlois, the juror whose conduct is in question, met at Morton's garage in Alburgh, pursuant to an agreement made by them the evening before by telephone, and then and there had a talk in the course of which Langlois said to Martelle: ''You tell Georgette that I will get all I can for her and do all I can for her.''

The only evidence of such talk is the testimony of George Rocque, which is, in effect, that he was in Morton's garage between seven and eight o'clock the morning of May 9, 1935; that said garage is in the north end of a building that stands on the west side of the main street in the village of Alburgh; that the south end of such building is used for a feed store; that there is a large entrance to the garage and also one to the feed store from the street, and an ordinary door between the latter room and the

garage; that he first saw Martelle and Langlois on the street in front of the feed store; that they entered the feed store together and were standing six or seven feet from the door between that room and the garage when the talk in question took place; that he was standing just through the door in the garage; that the entire conversation between Martelle and Langlois, except the word "Georgette," which was used three or four times, was in French "till they got ready to leave," when Langlois "told Martelle [in English] to tell Georgette he would do everything he could to help her and get all he could"; that Langlois then started for the garage office and Martelle went south from the garage; that he did not see them go away together.

As to why he happened to be at Morton's garage on that occasion Rocque testified that he wanted to see one Boyce, who lived about five hundred feet from said garage, about getting work; that he walked from his home, a distance of two and one-half miles, for that purpose; that he did not go to Boyce's house, but went to Morton's garage, expecting to see Boyce go past there on his way to work; that after waiting at Morton's garage around half an hour without seeing Boyce, he went to another garage in the village, thinking that Boyce might go that way to his work, and after waiting there some time without seeing Boyce, he went home without further attempt to see him.

Rocque's evidence as to how he came to tell anyone what he knew about the matter is that in November, following the trial, he rented a house of one John Horican (Horican owns nearly three-fourths of the capital stock of defendant company and is its treasurer and manager); and that the next March, when he went to pay Horican his rent, the latter said: "I don't know how much longer I will be here." (Defendant's property had then been advertised for sale on an execution issued on said judgment.) "So we got to talking about it and I told him what I overheard."

The truth of Rocque's story as to what took place at Morton's garage is challenged by the testimony of Martelle and Langlois. Both deny that they were together on the street of Alburgh that morning; that they were in the feed room or that they had any conversations whatever about the case on trial, and deny that Rocque was at the garage while they were there. They agree that it was arranged by telephone the evening before that Martelle would meet Langlois at Morton's garage at eight

o'clock that morning and ride to court with him. Martelle testified that when he got to the garage Langlois was there having a car tire fixed; that he went away, Martelle didn't know where; that he, Martelle, helped the garageman fix the tire; that about the time the work was completed Langlois returned, and he, the witness, and another juryman, Cheeseman, got into the car and drove away. Langlois testified that he left his car at the garage and went to Martin's store to get some cigars; that he stopped at the store a short time and when he got back to the garage Martelle was helping the garageman about the car; that he had not seen Martelle before that morning; that as soon as the car was ready, which was only a short time, he, Martelle, and Cheeseman started for court.

Cheeseman testified that when he got to the garage they had just finished putting the tire on the car; that he was there about two minutes before they started for court; that he did not remember seeing Rocque and would have remembered it if he had seen him.

Horican testified that he had known Rocque since the latter was a "kid," but said nothing about having seen him at Morton's garage, or elsewhere, the morning in question, although he testified that having learned that Martelle and Langlois were to meet at the garage, he "patrolled" the street in front of it for a distance of 1,200 feet, went over it three or four times in each direction, allowing an interval of several minutes between trips, trying to locate Martelle and Langlois.

The petitioner produced one Palmer in rebuttal, who testified that he saw Martelle and Langlois standing in the entrance to the feed store, and saw Rocque in the garage and waved his hand to him. Without discussing the evidence of this witness at length, it is enough to say that he was inclined to be somewhat garrulous, and the character of his evidence as a whole is such that we give little credence to that above stated.

Horican testified further that before his first talk with Rocque he had been trying to get information respecting the misconduct of some juryman who sat in the case as the basis for a new trial, and that Rocque's story was what he found; that after his first talk with Rocque he saw him several times regarding the matter before Rocque gave his affidavit.

It appeared that at the April Term, 1931, of Grand Isle county court Rocque pleaded guilty to the crime of burglary,

although he testified that he was not guilty, and gave as his reason for such plea that it was all "cooked" against him, he had no money with which to defend himself and was not told that the State would furnish him counsel.

Such is the substance of the evidence upon which we are asked to grant the petition.

■■ While this court will not hesitate to set aside a verdict, even in a doubtful case, where the misconduct of a juror is fairly made to appear, *McDaniels* v. *McDaniels*, 40 Vt. 363, 94 A. D. 408; *Flanders* v. *Mullins*, 73 Vt. 276, 50 Atl. 1055; *Grand Trunk R. R. Co.* v. *Davis*, 76 Vt. 187, 56 Atl. 982; *Austin & McCargar* v. *Langlois*, 81 Vt. 223, 69 Atl. 739, it is incumbent upon the party seeking such end to establish such misconduct by a fair balance of the evidence. In other words, a party who alleges the misconduct of a juror must establish it by the requisite degree of proof, but having established it, he need not necessarily show that he was actually harmed thereby. So here, the question is: Has the petitioner established the alleged misconduct by the requisite degree of proof? This question might be answered in the affirmative if Rocque's evidence was uncontradicted, although some parts of it are so improbable as to raise doubts concerning it as a whole. The reason he gives for being at Morton's garage as he claims to have been, the purpose of his trip, the distance he traveled, and his failure to do more than he claims to have done to see Boyce when so near the latter's home, is absurd, to say the least. More so is his account of what took place between Martelle and Langlois. He places them apart by themselves in the feed room, speaking French, both circumstances indicative of secrecy, yet, if his story is true, their interview closed by Langlois announcing, in English, loud enough so that it could be, and was, heard in an adjoining room, that he would do everything he could to help the plaintiff and get all he could for her. The first part of this narration tends to indicate what we are asked to find took place between Martelle and Langlois, but the latter part as clearly tends to indicate the contrary. Men do not ordinarily make public proclamation of clandestine agreements. Nor are we unmindful of the fact that when it is claimed Rocque revealed to Horican the facts upon which the petition is based, he was virtually a tenant of Horican's; that Horican was looking for evidence of such misconduct on the part of a juror as would vitiate the trial; and that he had known

Rocque since the latter was a "kid" and presumably knew his court record, which was of a character tending to cast doubt on his veracity. Without calling attention to other features of Rocque's evidence, or facts bearing upon its credibility, and without deciding whether, if undenied, it would support the petition, it is enough to say that when considered together with the countervailing evidence, to which attention has been called, it clearly does not.

*Petition denied.*